UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Christopher Campbell</u>

   v.                                         Civil No. 15-cv-88-JD
                                                Opinion No. 2015 DNH 143
<u>CGM, LLC</u>

O R D E R

The plaintiff, Christopher Campbell, brings this action
against the defendant, CGM, LLC ("CGM"), asserting claims for
(1) breach of contract; (2) fraud, deceit and misrepresentation;
(3) violation of the New Hampshire Consumer Protection Statute,
N.H. Rev. Stat. Ann. § 358-A ("Section 358-A"); and (4) unpaid
wages.  CGM moves to dismiss for lack of personal jurisdiction
and improper venue, or, in the alternative, to transfer the case
to the United States District Court for the Northern District of
Georgia.  Christopher Campbell objects.[1]

<u>Background</u>[2]

Christopher Campbell is an electrical engineer who, since
1995, has lived and worked in New Hampshire.  In the 1990s,

---

[1] Because Christopher Campbell's twin brother, Charles
Campbell, is a co-owner of CGM, to avoid confusion, this order
will refer to both Christopher and Charles by their first and
last names.

[2] The facts are summarized from the allegations in the First
Amended Complaint (doc. no. 4) and the documents submitted with
CGM's motion to dismiss and Christopher Campbell's objection.

Christopher Campbell founded a telecommunications company called Intellinet, Inc. ("Intellinet").  Intellinet was successful, and served clients in New England and New York.

In 2000, Intellinet began doing contract work for CGM, a Georgia telecommunications firm co-owned by Charles Campbell and Kevin Murphy.  As noted above, Charles Campbell is Christopher Campbell's twin brother.  Shortly thereafter, Christopher Campbell and Charles Campbell began discussing a prospective arrangement in which Christopher Campbell would become an employee of CGM, but would continue to live and work in New Hampshire.  The negotiations regarding Christopher Campbell's employment apparently took place largely by telephone, while Christopher Campbell was in New Hampshire, and Charles Campbell and Murphy were in Georgia.  The record also suggests that the parties may have met in person in Massachusetts to discuss the arrangement.

These discussions culminated in CGM offering Christopher Campbell an employment agreement.  The agreement provided that Christopher Campbell would receive annually a salary of $170,000 and a bonus consisting of 10% of CGM's annual earnings.  Based on financial representations allegedly made by CGM during the negotiations, Christopher Campbell expected that his bonus would be approximately $66,000 in the first year and would increase

2

each year thereafter.  The employment agreement contained a

choice of law provision, which provided as follows:

> This Agreement shall be deemed to be made in and shall
> in all respects be interpreted, construed and governed
> by and in accordance with the laws of the State of
> Georgia (without giving effect to the conflict of law
> principles thereof).

Employment Agreement (doc. no. 11-3) at 7.

Christopher Campbell signed and returned the employment

agreement in May of 2001, and began work as a CGM employee in

June.  Christopher Campbell remained a CGM employee until his

employment was terminated on January 31, 2015.

The parties dispute several aspects of the employment

relationship between Christopher Campbell and CGM.  As an

initial matter, the parties dispute whether CGM maintained

offices in New Hampshire during Christopher Campbell's tenure.

In support of its motion to dismiss, CGM submitted a written

declaration by Kevin Murphy, in which he denies that CGM ever

rented or maintained office space in New Hampshire.

For his part, Christopher Campbell claims that, from 2001

to 2006, he worked out of an office in Windham, New Hampshire;

from 2006 to 2011, he worked primarily from his home in New

Hampshire; and from 2011 until 2015, he worked out of an office

located in Salem, New Hampshire.  In an affidavit accompanying

his objection to the motion to dismiss, Christopher Campbell

states that CGM paid the rent on the Windham and Salem offices. Christopher Campbell has also produced financial records and email correspondence showing that CGM leased and paid for the office in Salem from 2011 to 2015.

The parties also dispute the nature and scope of the work that Christopher Campbell performed on behalf of New Hampshire-based clients.  Christopher Campbell alleges that when he began working for CGM, he redirected to CGM client payments that had previously gone to Intellinet, including revenues from a lucrative contract that Intellinet had secured with Verizon Communications ("Verizon").  At the time, Verizon had an agreement with the State of New Hampshire to provide certain state offices with telecommunications services.  Verizon employed CGM to perform these services, and as a result, Christopher Campbell worked directly with both Verizon and State of New Hampshire employees.

After FairPoint Communications ("FairPoint") purchased Verizon in 2008, Christopher Campbell negotiated a series of contracts with FairPoint.  As a result of these contracts, CGM performed work for FairPoint clients, including some twenty New Hampshire businesses and the State of New Hampshire. Christopher Campbell alleges that Murphy traveled on numerous

occasions to Concord, New Hampshire to meet with New Hampshire officials regarding work that CGM was performing for the state.

CGM denies ever having had clients in New Hampshire.  CGM asserts that the work Christopher Campbell performed in New Hampshire was performed directly for Verizon and FairPoint, which have their headquarters in Massachusetts and New York, and in Maine, respectively.

The relationship between Christopher Campbell and CGM began to sour almost immediately after Christopher Campbell's arrival at the company in 2001.  At the end of the 2001 fiscal year, CGM did not pay Christopher Campbell a bonus.  When he inquired, Charles Campbell informed him that the company did not have any earnings, so Christopher Campbell was not entitled to a bonus. Christopher Campbell asked to review CGM's books, but his brother refused.  Subsequently, Christopher Campbell did not receive a bonus in 2002, 2003, or 2004, and each time was told that the company had not produced any earnings.  At the end of 2005, CGM paid Christopher Campbell a bonus of $5,000, and indicated that the bonus was for earnings that the company had generated from 2001 to 2004.

In 2006, Charles Campbell informed Christopher Campbell that the company was doing poorly and that Christopher Campbell's salary would be decreased from $170,000 to $125,000

annually.  Christopher Campbell's salary apparently remained at $125,000 until CGM terminated his employment in January of 2015.

The claims in this case involve alleged financial improprieties committed by Charles Campbell and Kevin Murphy. Christopher Campbell alleges that he was misled about the precarious state of the company, and that CGM in fact had substantial earnings that Charles Campbell and Murphy hid from him for their own financial benefit.

## Discussion

CGM has moved to dismiss for lack of personal jurisdiction and improper venue, or, in the alternative, asks that the court transfer the case to the United States District Court for the Northern District of Georgia, where CGM has its headquarters. The court will consider the issues of personal jurisdiction, venue, and transfer in turn.

A.   Personal Jurisdiction

1.   Standard of Review

"A district court, faced with a motion to dismiss for lack of personal jurisdiction, Fed. R. Civ. P. 12(b)(2), 'may choose from among several methods for determining whether the plaintiff has met [its] burden' of proving that court's personal jurisdiction over the defendant."  N. Laminate Sales, Inc. v.

Davis, 403 F.3d 14, 22 (1st Cir. 2005) (quoting Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50-51 (1st Cir. 2002)).  The most common of these methods – and the one that the court will employ here – is the so-called prima facie standard, which requires the district court to "consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992).

"To make a prima facie showing of this calibre, the plaintiff ordinarily cannot rest upon the pleadings, but is obliged to adduce evidence of specific facts." Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995). "[T]he court, in a manner reminiscent of its role when a motion for summary judgment is on the table, must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." Id. (citations omitted); see also Bluetarp Fin., Inc. v. Matrix Constr. Co., Inc., 709 F.3d 72, 79 (1st Cir. 2013) ("The plaintiff's properly documented evidentiary proffers are accepted as true for purposes of making the prima facie showing, and we construe these proffers in a light most favorable to plaintiff's jurisdictional claim."). "A

court need not, however, credit bald allegations or unsupported

conclusions." Carreras v. PMG Collins, LLC, 660 F.3d 549, 552

(1st Cir. 2011).  Finally, to the extent that they are

uncontradicted, the court will consider facts offered by the

defendant.  Mass. Sch. of Law v. Am. Bar Ass'n, 142 F.3d 26, 34

(1st Cir. 1998).

     2.  <u>Due Process Analysis</u>

     As here, where subject matter jurisdiction exists based on

the diversity of citizenship of the parties, personal

jurisdiction over a nonresident defendant is governed by the

forum state's long-arm statute and by the constitutional

limitations of due process.  See Sawtelle v. Farrell, 70 F.3d

1381, 1387 (1st Cir. 1995).  The New Hampshire long-arm statute

permits the exercise of personal jurisdiction over a nonresident

defendant who, among other things, "in person or through an

agent, transacts any business within this state, [or] commits a

tortious act within this state . . . ."  N.H. Rev. Stat. Ann. §

510:4(I).  The New Hampshire Supreme Court has interpreted the

long-arm statute as affording jurisdiction over foreign

defendants "to the full extent that the statutory language and

due process will allow."  Sawtelle, 70 F.3d at 1388 (quoting

Phelps v. Kingston, 130 N.H. 166, 171 (1987)).  Therefore, the

court need only determine whether the application of personal

jurisdiction comports with Fourteenth Amendment due process requirements.  Id.

A court's personal jurisdiction over a defendant may take the form of general or specific jurisdiction.  Harlow v. Children's Hosp., 432 F.3d 50, 57 (1st Cir. 2005).  "For general jurisdiction the defendant must have continuous and systematic contacts with the forum state, but the particular cause of action may be unrelated to those contacts."  Bluetarp Fin., 709 F.3d at 79.  Specific jurisdiction, on the other hand, "exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities . . . ."  Mass. Sch. of Law, 142 F.3d at 34.  The requirements for the establishment of general jurisdiction are "considerably more stringent" than those for the establishment of specific jurisdiction.  Glater v. Eli Lilly & Co., 744 F.2d 213, 216 (1st Cir. 1984).

Christopher Campbell alleges in his complaint that this court has both general and specific personal jurisdiction over CGM.  Nevertheless, his opposition to the motion to dismiss seemingly abandons a general jurisdiction theory, and focuses almost exclusively on specific jurisdiction.  As such, the court will consider only specific jurisdiction.  See Pan v. Gonzales, 489 F.3d 80, 87 (1st Cir. 2007) ("[L]egal theories advanced in skeletal form, unaccompanied by some developed argumentation,

are deemed abandoned.").

"In order to subject a defendant who is not present in the forum state to a personal judgment, the Due Process Clause requires that the defendant 'have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Bluetarp Fin., 709 F.3d at 79 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  To determine whether specific jurisdiction exists, the First Circuit breaks the minimum contacts analysis into three categories - relatedness, purposeful availment, and reasonableness:

> As a general matter, the inquiry into specific jurisdiction comprises three questions.  First, the court must ask whether the asserted causes of action arise from or relate to the defendant's contacts with the forum.  Second, the court must consider whether the defendant purposefully availed itself of the protections of the forum's laws by means of those contacts, such that the defendant could reasonably foresee being haled into the forum's courts.  Third, the court must consider whether an exercise of jurisdiction is consistent with principles of justice and fair play.  Specific jurisdiction lies only if all of these queries are susceptible to affirmative answers.

Carreras, 660 F.3d at 554 (citations omitted).  The court considers each prong of the three-part test below.

a.   Relatedness

"To satisfy the relatedness prong, the cause of action must arise from or relate to the defendant's contacts with the forum state." Bluetarp Fin., 709 F.3d at 80.  This inquiry has been described as "flexible" and "relaxed," Pritzker v. Yari, 42 F.3d 53, 61 (1st Cir. 1994), and focuses on the "nexus between the defendant's contacts and the plaintiff's cause of action." Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 206 (1st Cir. 1994).  The nature of the inquiry varies slightly for claims sounding in contract versus tort law.  Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 289 (1st Cir. 1999).

For contract-based claims such as Count I (breach of contract) and Count IV (unpaid wages), the court assesses whether the defendant's forum-based activity was instrumental in the contract's formation or breach.  Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007).  The court also considers the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . ." Daynard, 290 F.3d at 52 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 (1985)).

CGM argues that the contract claims cannot satisfy the relatedness requirement because the contract was both formed and

breached in Georgia, where Charles Campbell and Kevin Murphy
made all decisions regarding Christopher Campbell's employment
and compensation.  Nevertheless, Christopher Campbell has
established that New Hampshire-based activity was an essential
factor in the negotiation and formation of the employment
agreement, as well as a central component of the parties'
contemplated future dealings.

When the parties began negotiating in 2001, Christopher
Campbell was a New Hampshire resident and had already secured,
for Intellinet, a lucrative contract with Verizon that required
him to perform work for many New Hampshire clients.  While "the
mere existence of a contractual relationship between an out-of-
state defendant and an in-state plaintiff does not suffice, in
and of itself," Phillips Exeter, 196 F.3d at 290, Christopher
Campbell has established that the employment agreement was
executed with the understanding that he would work for CGM from
New Hampshire, servicing numerous New Hampshire-based clients,
while directing the resulting revenues to CGM.  Thus, at the
time that the employment agreement was negotiated and executed,
CGM reasonably expected that it would generate revenues from
work performed in New Hampshire for New Hampshire-based clients.
See Jet Wine & Spirits, Inc. v. Bacardi & Co. Ltd., 298 F.3d 1,
10 (1st Cir. 2002) (quoting McGee v. Int'l Life Ins. Co., 355

U.S. 220, 223 (1957) ("It is sufficient for purposes of due process that [a] suit [is] based on a contract which had substantial connection with that State.")).

An assessment of the parties' actual course of dealing also supports a finding of personal jurisdiction.  Christopher Campbell worked for CGM for some fourteen years under the employment agreement that he alleges was breached.  During that time, he generated significant revenues for CGM and established and maintained client relationships with the State of New Hampshire, Verizon, FairPoint, and other New Hampshire-based businesses.  Kevin Murphy even visited New Hampshire for the purpose of conducting business with the clients that Christopher Campbell had recruited.  As such, Christopher Campbell and CGM had a course of dealing in New Hampshire, pursuant to the employment agreement whose alleged breach is the subject of this litigation.  See C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 66 (1st Cir. 2014) ("[T]he evidence of contacts during the course of dealing is powerful.  [Defendant] had an ongoing connection with Massachusetts in the performance under the contract.  [Plaintiff's] claims arise from the alleged breach of that contract.  That is enough to establish relatedness.").  In sum, the alleged breaches of the employment

agreement are closely related to the State of New Hampshire, and are adequate to support a finding of personal jurisdiction.

For claims based on alleged tortious conduct, such as Count II (fraud, deceit and misrepresentation) and Count III (false and deceptive acts committed in violation of Section 358-A), courts must "probe the causal nexus between the defendant's contacts and the plaintiff's cause of action."[3] Phillips Exeter, 196 F.3d at 289. An "in-forum effect of an extra-forum" act, alone, is generally insufficient. Id. at 291.

As CGM contends, most all of the critical decisions regarding Christopher Campbell's employment were made in Georgia, where CGM's offices are located. Although the employment agreement was principally negotiated over the phone, with Christopher Campbell in New Hampshire, and Charles Campbell and Kevin Murphy in Georgia, the decisions to hire, and later fire, Christopher Campbell took place in Georgia. Likewise, Charles Campbell and Murphy made decisions about Christopher Campbell's annual bonuses and reduction in salary in Georgia,

---

[3] While the Section 358-A claim is not, strictly speaking, a tort claim, it effectively requires that Christopher Campbell prove that CGM committed fraud by engaging in an "unfair or deceptive act or practice." N.H. Rev. Stat. Ann. § 358-A:2. Thus, the court will apply the relatedness framework applicable to tort-based claims. See Remsburg v. Docusearch, Inc., No. 00-cv-211-B, 2002 WL 130952, at *4 (D.N.H. Jan. 31, 2002) (finding that the tort-based framework is properly applied to a claim brought under Section 358-A).

and relayed those decisions to Christopher Campbell in New Hampshire.

Nevertheless, Christopher Campbell's tort-based claims do more than allege merely that he was adversely affected in New Hampshire by decisions made in Georgia.  These claims allege that Charles Campbell and Kevin Murphy affirmatively misled him about CGM's financial strength and performance, with the intent of denying compensation owed to him under the terms of the employment agreement.  This compensation was directly tied to CGM's performance, both because his annual bonus was to be calculated as a percentage of revenues, and because his reduction in salary was explained as a necessary cost-cutting measure given the company's poor performance.

Christopher Campbell has established that his work in New Hampshire for, among other clients, Verizon, FairPoint, and the State of New Hampshire, generated substantial revenues for CGM (some $150,000 annually according to Christopher Campbell's estimates).  Christopher Campbell has provided evidence that he was falsely led to believe that CGM was doing poorly, while these New Hampshire-based revenues (and other revenues) went to CGM and benefitted Charles Campbell and Kevin Murphy.  Thus, Christopher Campbell has established a causal nexus between CGM's contacts with New Hampshire and his tort-based claims.

   b.   Purposeful Availment

     The court's exercise of specific personal jurisdiction
further requires that CGM's contacts "represent a purposeful
availment of the privilege of conducting activities in the forum
state, thereby invoking the benefits and protections of that
state's laws and making the defendant's presence before the
state's courts foreseeable." Bluetarp Fin., 709 F.3d at 82
(quoting Hannon v. Beard, 524 F.3d 275, 284 (1st Cir. 2008)).
"Purposeful availment represents a rough quid pro quo: when a
defendant deliberately targets its behavior toward . . . a
particular forum, the forum should have the power to subject the
defendant to judgment regarding that behavior." Carreras, 660
F.3d at 555.  The inquiry focuses on the defendant's intentions;
the defendant's contacts with the forum state must be voluntary
and deliberate, and the contacts must be of such a nature that
the defendant can reasonably foresee being haled into court
there. Bluetarp Fin., 709 F.3d at 82.

     CGM argues that it did not direct activity toward New
Hampshire at all.  In his declaration, Kevin Murphy maintains
that CGM did not lease office space in New Hampshire, did not
solicit business in New Hampshire, and did not have any New
Hampshire customers.  Christopher Campbell contends that these
statements are simply untrue.  He argues that CGM directed

activity toward New Hampshire by leasing office space from 2001 to 2006 and from 2011 to 2015, and by servicing numerous New Hampshire clients, including the state government.  What is more, Christopher Campbell has offered evidence establishing that CGM provided him with a New Hampshire health care plan, and treated him as a New Hampshire employee by not withholding Georgia income tax.

In applying the prima facie standard to assess personal jurisdiction, this court must accept Christopher Campbell's properly-documented evidentiary proffers as true.  See Bluetarp Fin., 709 F.3d at 79.  Here, the proffers are sufficient to conclude that CGM purposefully and voluntarily sought to establish a commercial presence in New Hampshire.  Christopher Campbell has produced financial records establishing that CGM leased and paid for office space in New Hampshire, and that CGM considered him to be a New Hampshire employee as evidenced by the fact that he was given a local health care plan and was treated as a New Hampshire resident for tax purposes.

In addition, CGM established and developed professional relationships in New Hampshire, as evidenced in part by Kevin Murphy's multiple trips to New Hampshire to meet with government officials regarding work that CGM was performing for the state. As described above, these contacts resulted in significant

revenues for CGM, and the contacts were sufficient for CGM to reasonably foresee being subject to the jurisdiction of the New Hampshire courts.  See, e.g., JKA, Inc. v. Anisa Int'l, Inc., C.A. No. 07-123S, 2008 WL 4949126, at *6-8 (D.R.I. Nov. 13, 2008) (finding specific jurisdiction in Rhode Island where an employee of the defendant Georgia corporation maintained a home office in Rhode Island, held business meetings there, generated significant revenues for the defendant from in-state sales, and was treated as a Rhode Island employee for tax purposes).  In other words, CGM purposefully availed itself of the privilege of conducting activities in New Hampshire.

c.   Reasonableness

"The final piece of the puzzle is that an exercise of jurisdiction must be reasonable . . . consistent with principles of justice and fair play." Bluetarp Fin., 709 F.3d at 83.  In conducting this analysis, courts weigh the so-called gestalt factors: (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies. Adelson, 652 F.3d at 83.

CGM does not address these factors directly in the context of personal jurisdiction.  Rather, in its memorandum submitted in support of its motion to dismiss, CGM addresses these and other similar factors in the context of its request that the court transfer the matter to the Northern District of Georgia. Indeed, the parties both give somewhat short shrift to the gestalt factors.  In brief, CGM contends that it would be unduly burdensome to litigate this matter in New Hampshire because the overwhelming majority of its employees and prospective witnesses live in Georgia.  Christopher Campbell argues, without a great deal of elaboration, that it may be cost-prohibitive for him to litigate this case outside of New Hampshire.

Upon consideration of the gestalt factors, the court finds that the exercise of personal jurisdiction over CGM is reasonable.  Although CGM focuses principally on the first factor – its burden of appearing in New Hampshire – "staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly," and in order to prevail on this issue, CGM must show "some kind of special or unusual burden."  Pritzker, 42 F.3d at 64.  CGM has fallen short of this requirement.

The balance of the gestalt factors, particularly New Hampshire's interest in adjudicating the dispute, and Christopher Campbell's interest in obtaining convenient and

effective relief, also weigh in favor of a finding of jurisdiction.[4]  With respect to New Hampshire's interest in the adjudication of the dispute, the First Circuit has recognized that states have a "stake in being able to provide a convenient forum for [their] residents to redress injuries inflicted by out-of-forum actors." Adelson, 510 F.3d at 51 (citations omitted) (internal quotation marks omitted).  Furthermore, that the State of New Hampshire worked directly with CGM weighs in favor of the local adjudication of the dispute.

Christopher Campbell also has a compelling interest in the case being heard in New Hampshire.  He has been a New Hampshire resident since 1995 and founded and grew Intellinet in New Hampshire before joining CGM.  See Sawtelle, 70 F.3d at 1395 ("[The First Circuit] has repeatedly observed that a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience.").

3.  Conclusion

In sum, CGM established and maintained minimum contacts with the State of New Hampshire which are sufficient to subject CGM to the specific personal jurisdiction of this court.

---

[4]  Neither party addressed the fourth and fifth gestalt factors and, in any event, they do not appear to be relevant.

Therefore, CGM is not entitled to dismissal for lack of personal jurisdiction.

B.   Venue

   1.   Standard of Review

   28 U.S.C. § 1391(b) provides, in relevant part:

   A civil action may be brought in – (1) a judicial
   district in which any defendant resides, if all
   defendants are residents of the State in which the
   district is located; [or] (2) a judicial district in
   which a substantial part of the events or omissions
   giving rise to the claim occurred . . . ."

   A defendant corporation "shall be deemed to reside . . . in any judicial district in which [it] is subject to the court's personal jurisdiction . . . ."  Id. at § 1391(c)(2).  In other words, venue is proper as to a corporate defendant if the court has personal jurisdiction over the corporation, or if a "substantial part" of the underlying events or omissions occurred in the district.[5]

   2.   Application

   CGM does not address the issue of whether venue is proper in New Hampshire on the basis of personal jurisdiction, but

---

   [5] While tort and contract claims must be considered separately for purposes of analyzing personal jurisdiction, "the distinction between tort and contract is immaterial to the requirements for venue . . . ."  Uffner v. La Reunion Francaise, S.A., 244 F.3d 38, 41 (1st Cir. 2001).

argues that all of the critical events or omissions giving rise to the case occurred in Georgia.  Christopher Campbell briefly addresses the issue of venue, and asserts, without explanation, that "there can be no serious question that this case is properly brought in the District of New Hampshire."  See doc. no. 11-1 at 8.

For the reasons described above, the court has personal jurisdiction over CGM, a corporate defendant, and therefore venue is proper in this district.[6]  See Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 11 n.6 (1st Cir. 2009) ("Because we have concluded that [defendant] is subject to personal jurisdiction in Rhode Island, we can also conclude that [defendant], a corporation, 'resides' in Rhode Island pursuant to 28 U.S.C. § 1391(c).");  see also Sarah's Hat Boxes, L.L.C. v. Patch Me Up, L.L.C., 12-cv-399-PB, 2013 WL 1563557, at *9 (D.N.H. Apr. 12, 2013) (finding proper venue where the court had determined that two corporate defendants were subject to its specific personal jurisdiction).  There is no need to separately

---

[6] That CGM is a limited liability company, and not a corporation, is of no consequence.  See, e.g., Graham v. DynCorp Int'l, Inc., 973 F. Supp. 2d 698, 701 n.2 (S.D. Tex. 2013) ("Courts . . . including the Supreme Court, had long interpreted . . . [28 U.S.C. § 1391(c)] to include unincorporated associations like partnerships and LLCs.").

address the issue of whether a "substantial part" of the
underlying events occurred in New Hampshire.

C.   Transfer

     As an alternative to dismissal on the basis of personal
jurisdiction or improper venue, CGM requests that the court
transfer the case to the United States District Court for the
Northern District of Georgia, where CGM is headquartered.

     1.   Standard of Review

     28 U.S.C. § 1404(a) provides that "[f]or the convenience of
parties and witnesses, in the interest of justice, a district
court may transfer any civil action to any other district or
division where it might have been brought . . . ."[7]  "The burden
of proof rests with the party seeking transfer; there is a
strong presumption in favor of the plaintiff's choice of forum."
Jackson Nat'l Life Ins. Co. v. Economou, 557 F. Supp. 2d 216,
219-20 (D.N.H. 2008) (quoting Coady v. Ashcraft & Gerel, 223
F.3d 1, 11 (1st Cir. 2000)).  The court has wide latitude in
determining whether to grant a motion to transfer venue.  Id. at

---

     [7] CGM contends, and Christopher Campbell does not dispute,
that this action could have been brought in the Northern
District of Georgia.

220 (citing Auto Europe, LLC v. Conn. Indem. Co., 321 F.3d 60, 64 (1st Cir. 2003)).

### 2.   Application

Section 1404(a) enumerates three grounds on which to transfer: convenience of the parties, convenience of the witnesses, and the interest of justice.  Courts in this Circuit have broken these grounds into so-called "private interest" and "public interest" factors.  Id. (citing Coady, 223 F.3d at 11).  The court will weigh the private interest and public interest factors separately.

#### a.   Private Interest Factors

The private interest factors are: (1) the plaintiff's choice of forum; (2) the location of the operative events in the case; (3) the convenience of the parties; (4) the convenience of the witnesses; (5) the cost of obtaining witnesses; (6) the location of counsel; (7) the ability to compel the attendance of witnesses; (8) the accessibility and location of sources of proof; (9) the possibility of a jury view; and (10) the existence of a contractual forum selection clause.  Id. (citing Coady, 223 F.3d at 11) (further citations omitted).

Christopher Campbell chose to bring his suit in this court. As CGM acknowledges, "unless the balance [of the private

interest factors] is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Adam v. Haw. Prop. Ins. Ass'n, No. 04-342-SM, 2005 WL 643358, at *3 (D.N.H. Mar. 21, 2005) (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)).

CGM contends, correctly, that the majority of the operative events in this case took place in Georgia, where decisions regarding Christopher Campbell's employment and compensation were made.  Thus, this factor weighs in favor of transfer.

The third factor – the convenience of the parties – does not fall in favor of either party.  Christopher Campbell is a New Hampshire resident, while CGM is a resident of Georgia for purposes of venue.

CGM devotes substantial focus to the fourth and fifth factors – the convenience of the witnesses, and the cost of obtaining witnesses.  CGM argues that fourteen of its fifteen employees are Georgia residents, and that getting them to New Hampshire to testify would be burdensome and costly.  CGM contends that requiring Christopher Campbell to travel to Georgia would be relatively less difficult.

The problem with CGM's argument is two-fold.  As an initial matter, it is unlikely that all of CGM's employees will be witnesses at trial.  The relevant witnesses will be those who

can offer firsthand knowledge of the operative facts in the case – those regarding Christopher Campbell's employment and CGM's financial strength.  Probable witnesses include Charles Campbell and Kevin Murphy, as well as a handful of additional employees, and perhaps several of CGM's third-party service providers such as accountants.

It is likely that Christopher Campbell will need to call New Hampshire-based witnesses other than himself.  As an example, in opposition to the motion to dismiss, Christopher Campbell included the affidavit of an officer of FairPoint. Christopher Campbell may need to call other witnesses who can testify regarding work that CGM performed in New Hampshire, and the revenues that the work generated, as evidence of CGM's financial strength.

A judge of this court has previously observed that "[t]he availability and convenience of witnesses is the most important factor in [the] balancing test." Sousa v. TD Banknorth Ins. Agency, Inc., 429 F. Supp. 2d 454, 457 (D.N.H. 2006).  In this case, the convenience of the witnesses and the cost of obtaining witnesses weigh in CGM's favor, but only by a small margin given the limited number of witnesses likely to testify for either side.

The sixth factor, the location of counsel, does not favor either side.  CGM's lead counsel is located in Georgia, while Christopher Campbell is represented by New Hampshire counsel.

The seventh factor, the ability to compel the attendance of witnesses, focuses on any uncooperative or indifferent witnesses who might prefer not to testify at trial.  Jackson, 557 F. Supp. 2d at 222.  This court's ability to compel the testimony of witnesses is limited to persons who reside or work within 100 miles of the location of the trial.  Fed. R. Civ. P. 45(c)(1). Here, it is likely that CGM will rely on the testimony of at least several employees and third-party service providers who fall outside of this court's subpoena power.  Nevertheless, as discussed previously, Christopher Campbell may rely on additional New Hampshire-based witnesses, who are likely to be outside of the subpoena power of a district court sitting in the Northern District of Georgia.  What is more, the CGM witnesses beyond this court's subpoena power are employed by, or are closely affiliated with, CGM such that they would be unlikely to refuse to testify on CGM's behalf.  See Sousa, 429 F. Supp. 2d at 458 ("Many of the witnesses who live and work [out of state] are current [employees of the defendant] who are likely to comply with their employer's request to testify.").  In sum, the seventh factor narrowly favors CGM because it is likely that a

disproportionate number of its witnesses will be beyond the reach of this court's subpoena power.

CGM argues that the eighth factor, the accessibility and location of sources of proof, weighs in its favor.  The evidence in this case will consist largely of testimony regarding the employment relationship between Christopher Campbell and CGM, as well as financial records related to CGM's performance.  CGM does not suggest that these records are unavailable in electronic formats, or are not otherwise easily transportable.  As such, the eighth factor does not favor either party.

The ninth factor, the possibility of a jury view, is inapplicable.  The tenth factor, the existence of a contractual forum selection clause, is inapplicable as well.  Christopher Campbell's employment agreement contains a choice of law provision, which states that the agreement shall be "interpreted, construed and governed by and in accordance with the laws of the State of Georgia."  A choice of law provision denotes which state's laws will govern the interpretation of the contract, while a forum selection clause generally denotes the court in which any resulting dispute will be heard.  Compare C.W. Downer & Co., 771 F.3d at 63 (choice of law provision), with Carter's of New Bedford, Inc. v. Nike, Inc., __ F.3d __, 2015 WL 3876703 (1st Cir. 2015) (forum selection clause).  As

such, the fact that the employment agreement contains a choice of law provision has no bearing on the court's transfer analysis.

Of the ten private interest factors, just one – the plaintiff's choice of forum - weighs in Christopher Campbell's favor. One factor, the location of the operative events in the case, weighs in CGM's favor. Several of the others weigh slightly in CGM's favor: the convenience of the witnesses, the cost of obtaining witnesses, and the ability to compel the attendance of witnesses. The remaining factors are either not relevant or are neutral. In sum, though a close call, the court finds that the private interest factors that weigh in CGM's favor are together inadequate to overcome the deference afforded Christopher Campbell's chosen forum. See Adam, 2005 WL 643358, at *3; see also Sousa, 429 F. Supp. 2d at 457 ("[Plaintiff] has chosen to bring this action in her home state, and . . . there is a strong presumption that her choice of forum should not be disturbed.").

b.   Public Interest Factors

The public interest factors require the court to consider: (1) administrative difficulties caused by court congestion; (2) local interest in the controversy and the burden of jury duty; and (3) the proposed forum's familiarity with the governing law.

Jackson, 557 F. Supp. 2d at 223 (citing Coffey v. Van Dorn Iron Works, 796 F.2d 217, 220-21 (7th Cir. 1986)).

The first factor, assessing the administrative difficulties caused by court congestion, weighs in favor of the case remaining in the District of New Hampshire.  CGM has provided data from the Judicial Caseload Profile Reports demonstrating that there are 209 pending cases per judge in the District of New Hampshire, while there are 448 pending cases per judge in the Northern District of Georgia.  Therefore, there will be less burden on judicial resources if the case remains in the District of New Hampshire.

The second factor, local interest in the controversy and the burden of jury duty, is neutral and does not favor either party.  Presumably, both Georgia and New Hampshire have an interest in the outcome of the dispute, and the burden of jury duty is the same in both jurisdictions.

The third factor calls on the court to assess its familiarity with the governing law.  As noted previously, the employment agreement contains a choice of law provision that requires that the agreement be interpreted and construed in accordance with Georgia law, a factor that would normally weigh in favor of transfer.  See Jackson, 557 F. Supp. 2d at 223-24

(noting that the application of out-of-state law favors transfer, but does not compel it).

Nevertheless, despite the choice of law provision in the employment agreement, this third factor does not favor either party.  Two of the four claims in this case plainly require the application of Georgia law: Count I for breach of contract, and Count II for fraud, deceit and misrepresentation.  Counts III and IV, however, are brought under New Hampshire law.  Count III is brought under Chapter 358-A, New Hampshire's consumer protection statute.  Count IV asserts a claim for unpaid wages, and is brought under N.H. Rev. Stat. Ann. § 275.  Because two counts call for the application of New Hampshire law, and two call for the application of Georgia law, presumably this court or a court sitting in the Northern District of Georgia are equally suited to hear the case.

In sum, two of the three public interest factors are neutral, while the factor assessing the administrative difficulties caused by court congestion favors the case remaining in the District of New Hampshire.

3.   <u>The Balance of the Private and Public Interest Factors</u>

For the reasons described, the court finds that the private interest factors that favor CGM are insufficient to overcome the priority afforded Christopher Campbell's choice of forum.  This

31

finding is further supported by the fact that the public interest factors weigh against transferring the case. For these reasons, the court declines to transfer the case to the Northern District of Georgia.

## Conclusion

For the foregoing reasons, CGM's motion to dismiss for lack of personal jurisdiction and improper venue, or, in the alternative, to transfer the case to the United States District Court for the Northern District of Georgia (document no. 8) is denied.

SO ORDERED.

Joseph A DiClerico, Jr.
Joseph DiClerico, Jr.
United States District Judge

July 20, 2015

cc:  Matthew T. Gomes, Esq.
     Timothy John McLaughlin, Esq.
     David P. Slawsky, Esq.