UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Christopher Campbell

    v.                                    Civil No. 15-cv-088-JD
                                            Opinion No. 2017 DNH 004
CGM, LLC


O R D E R


Christopher Campbell, brings this action against his former
employer, CGM, LLC, asserting claims for breach of contract;
fraud, deceit and misrepresentation; violation of the New
Hampshire Consumer Protection Act, RSA Chapter 358-A; and unpaid
wages under RSA chapter 275.  CGM brought counterclaims against
Campbell for breach of contract; conversion; violation of the
Computer Fraud and Abuse Act, 18 U.S.C. § 1030; tortious
interference with contract; punitive damages; and injunctive
relief.  Both Campbell and CGM have filed motions for summary
judgment.


Standard of Review

Summary judgment is appropriate when the moving party
"shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  "A genuine dispute is one that a

reasonable fact-finder could resolve in favor of either party
and a material fact is one that could affect the outcome of the
case." Flood v. Bank of Am. Corp., 780 F.3d 1, 7 (1st Cir.
2015). Reasonable inferences are taken in the light most
favorable to the nonmoving party, but unsupported speculation
and evidence that "is less than significantly probative" are not
sufficient to avoid summary judgment. Planadeball v. Wyndham
Vacation Resorts, Inc., 793 F.3d 169, 174 (1st Cir. 2015)
(internal quotation marks omitted).

When considering cross motions for summary judgment, the
court must "determine whether either of the parties deserves
judgment as a matter of law on facts that are not disputed."
Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir.
2004) (internal quotation marks omitted). To do that, the court
views each motion separately, taking the facts in the light most
favorable to the nonmoving party and drawing inferences in the
nonmoving party's favor. OneBeacon Am. Ins. Co. v. Commercial
Union Assurance Co. of Canada, 684 F.3d 237, 241 (1st Cir.
2012).

Evidentiary Issues

Campbell previously moved to strike the declaration of
Duane Szarek submitted by CGM in support of its objection to
Campbell's motion for summary judgment. Campbell asserted that
the declaration impermissibly provided expert opinions when

Szarek had not been disclosed as an expert witness.  The court granted the motion to strike, and Szarek's declaration is not considered for purposes of the motions for summary judgment.

CGM challenges statements made by Campbell in his affidavits as presenting "sham" affidavits.  Specifically, CGM states that Campbell's statements in his affidavit dated June 1, 2015, that his company, Intellinet, had billings of "approximately $250,000" and that the subject line on the check to Campbell from CGM for $5,000 "indicated that this was the bonus [he] had earned on annual earnings from 2001 – 2004" are contradicted by deposition testimony given almost a year later on April 25, 2016.  CGM also asserts that most of Campbell's October 24, 2016, affidavit is a sham because Campbell "attempts to contradict his clear deposition answers to unambiguous questions without explanation."

In the First Circuit, "'[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory' without providing 'a clear satisfactory explanation of why the testimony is changed.'" Colburn v. Parker Hanninfin/Nichols Portland Div., 429 F.3d 325, 332 (1st Cir. 2005) (quoting Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994)).  That is, "a party opposing summary judgment may not manufacture a dispute of fact by

contradicting his earlier sworn testimony without a satisfactory explanation of why the testimony has changed." Abreu-Guzman v. Ford, 241 F.3d 69, 74 (1st Cir. 2001). "A subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment." Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 26 (1st Cir. 2002)

The sham affidavit rule does not apply to the challenged statements from the June 1, 2015, affidavit.  The affidavit was prepared **before** Campbell was deposed, not after.  The affidavit was prepared in support of Campbell's objection to CGM's motion to dismiss and was filed as additional <u>support</u> for Campbell's later motion for summary judgment.  Therefore, the affidavit was not prepared to manufacture a factual dispute for purposes of opposing summary judgment.

In addition, the challenged statements do not clearly contradict Campbell's deposition testimony.  The affidavit says Intellinet had "billings of approximately $250,000" and Campbell's deposition testimony was that he did not know the <u>most</u> Intellinet had ever grossed in a year.  Further, Campbell provided an adequate explanation of the differences in his Reply Affidavit, dated October 24, 2016.  The statement about the bonus check is merely Campbell's interpretation of the subject line on the check.

4

The Reply Affidavit, dated October 24, 2016, provides an explanation of Campbell's statements about Intellinet's revenue and addresses statements made by CGM's founders in their declarations and deposition testimony. Because CGM asserts only that "most" of Campbell's affidavit is a sham, without explaining what statements clearly contradict Campbell's deposition testimony, CGM has not provided a sufficient explanation of the sham affidavit charge to permit review.

Therefore, none of the statements in Chris Campbell's affidavits are precluded as shams.

## Background

The background information is summarized from the parties' factual statements, with disputed facts noted as necessary.[1]

---

[1] CGM's memorandum in support of its motion for summary judgment is thirty-three pages long and its objection to Campbell's motion is thirty-one pages long. Under the local rules in this district, "no memorandum in support of, or in opposition to, a dispositive motion shall exceed twenty-five (25) pages." LR 7.1(a)(3). As CGM did not seek leave to file longer memoranda, its filings do not comply with the local rule.
Chris's memorandum in support of his motion for partial summary judgment does not have page numbers as is required by Local Rule 5.1(a).
The court may impose a fine against counsel who have violated a local rule governing the form of filings, may strike the nonconforming filing, or may excuse a failure to comply "whenever justice so requires." LR 1.3; LR 5.2. In this case, the court will excuse counsel's failures to comply with the page limits and numbering with instruction to counsel that the local rules in this district shall be followed in the future or sanctions will be imposed.

This case involves claims between Christopher "Chris" Campbell, the plaintiff, and CGM, LLC, which was founded and is operated by Chris's twin brother, Charles "Chuck" Campbell, and Chuck's business partner, Kevin Murphy.  Hereafter, to avoid confusion between the Campbells, the individuals will be referred to by their first names as Chris, Chuck, and Kevin.

Chris is an electrical engineer who founded Intellinet, Inc., a telecommunications business, that operated in Massachusetts and New Hampshire.  CGM was founded by Chuck, Kevin, and a third partner who is no longer with the company, and operates in Georgia.  CGM originally provided consulting services to telecommunications companies and now provides data processing and software development compliance services to telephone companies.  Kevin is responsible for CGM's administrative and financial functions, and Chuck is responsible for business development.

Intellinet did contract work for CGM in 2000.  In early 2001, Chuck proposed that Chris become an employee of CGM. Chris was interested in Chuck's proposal.  At the same time, another company, CCG Consulting, was considering acquiring CGM.

On March 27, 2001, Chuck sent Chris an email with the subject of "New Christo Proposal."  In the email, Chuck said that the previous deal they had discussed was an "$180K annual

package plus 10% of EBITDA."[2]   The new proposal was "$160K annual package plus 6% of EBITDA plus 10% of CCG stock."   Chuck noted that he was concerned about Chris's monthly cash flow and the EBITDA payout in the first year.   He explained the differences between the proposal if CGM were acquired by CCG and if it were not acquired.[3]   In closing Chuck wrote: "If the deal with CCG doesn't go through, we'll move right back to the previous deal. Please give me a buzz after you've looked it over and let's get something inked."

Chuck attached a spreadsheet to the email that is titled "Christo CGM deal" and is dated "3/26/2001."   The spreadsheet provided projections for four years of annual salary and "EO" for each year.   The projections were for "Previously Discussed Christo Deal" and "Proposed Christo Deal w/ CGM Acquisition." Chuck stated:  "Previous proposal was to give you 10% of the companies [sic] bottom line earnings, going forward, plus $180K package (salary plus bennies).  We figured cost of bennies were [sic] approximately 1K/mo and your monthly pretax check would be $14K."   Chuck also provided a projected stock value and explanation of the calculations.   Chuck wrote:  "We think we are

---

[2] EBITA appears to mean earnings before interest, taxes, depreciation, and amortization.

[3] CGM mistakenly asserts that Chuck's spreadsheet "set forth estimates of CGM's projected performance <u>after</u> the possible CCG acquisition."

a better company with you on board and want to craft a deal that
works for all of us."

In the course of the negotiations, Chris was given an
employment agreement.  CGM represents that the employment
agreement originated with CCG Consulting and was then modified
by CGM and its attorneys.  CGM also states that the employment
agreement was required by CCG as part of the proposed
acquisition that was being considered at that time.  Chuck
testified during his deposition that there were different
versions of the employment agreement.  The acquisition by CCG
did not go through.

Chris signed the employment agreement, which is dated May
24, 2001, but has an effective date of April 23, 2001.[4]  He
testified that he gave the signed original of the agreement to
Chuck.  No one signed the agreement on behalf of CGM.  Chris
began to work at CGM on June 1, 2001.

The copy of the employment agreement that Chris produced is
seven pages long and jumps from Section 8 to Section 13, which
is the last section.  The agreement states that it is effective

_____

[4] CGM disputes that Chris signed the employment agreement at
the time it is dated and returned it to CGM.  CGM also
represents that no other CGM employee has an employment
agreement. Chuck accuses Chris of signing the agreement only
after he brought suit against CGM.
   Alan Schrank, who works for CGM as a contractor, testified in
his deposition that he does have a written contract with CGM
although he does not have a copy of it.

as of April 23, 2001, and is between Chris and CGM, LLC.  The agreement provides that Chris will be paid an annual salary of $170,000 in monthly installments as the base salary.  In addition, Chris will "receive 10% of the annual earnings of Company (prorated in year one), to be calculated on a calendar year basis, and to be paid upon formal closure of the Company's [CGM's] annual books."

The agreement further provided that if the acquisition by CCG went through, Chris's annual salary would be reduced to $150,000 and the bonus would be transferred "to an identical percentage of Company's stock in the acquiring entity."  It also provided for a closing bonus after the acquisition.  CGM agreed to pay the cost of Chris's existing medical benefits plan.  The agreement included provisions for termination, nondisclosure of trade secrets and confidential information, non-solicitation and non-recruitment covenants, CGM's right to materials and the return of materials, and compliance with policies and laws.  The last section, titled "Miscellaneous", includes clauses for severability, waiver, governing law, and merger.

Chris's initial annual salary at CGM was $180,000.  At the end of 2001, no bonus was paid.  Chris represents that he asked about the bonus, and Chuck told him that CGM had no earnings so no bonus could be paid.  Chris asked to review CGM's books, but Chuck refused.  The same thing happened in 2002 and 2003 with

9

Chuck representing that the company was operating without earnings.

In 2005, Chris again asked about his bonus.  CGM gave Chris a check for $5,000.  The subject line on the check said:  "2001-2004 (Thanks!)."  Chris understood that the check was for his bonuses for those years.[5]  Chuck prepared a spreadsheet to show that CGM was not as profitable as Chris thought it was.

As the economy generally began to decline in 2006, CGM experienced financial difficulties.  For that reason, CGM reduced salaries.  On October 1, 2006, Chris's salary was reduced to $125,000 and his medical benefit plan was also changed.  He understood that the reduction was temporary until business improved.

Chuck told Chris that he and Kevin were making personal financial contributions to CGM and were hoping that the company's finances would improve in the future.  Chris understood that everyone was making sacrifices for the good of the company.  Chuck said that Chris was the highest paid person at CGM and that Chuck and Kevin were only being paid approximately $86,000 each.  Chris represents that CGM's financial documents, which he has reviewed as part of this suit,

---

[5] In Chris's objection to CGM's motion for summary judgment, he states:  "There is no dispute, however, that during those early years, CGM struggled financially."  Doc. 48 at 3.

show that CGM's annual earnings were much greater than Chuck and Kevin represented them to be.

In late 2008 or early 2009, Chris thought that CGM's financial status had improved and asked about returning his salary to its former amount.  Chuck and Kevin denied Chris's request on the ground that Chris was not maximizing his potential at CGM.  In the spring of 2009, Chuck told Chris that he could increase his income by earning commissions.  CGM offered commissions to be paid on amounts received from Verizon and FairPoint.  During his deposition, Chris agreed that the commissions were a change in his compensation.[6]  CGM paid Chris commissions from 2009 through 2015, with some changes in the commission plan.

CGM's bookkeeper from 2009 to 2011 testified during her deposition that Kevin told her not to pay Chris his commissions unless he asked for them.  When Chris asked for his commissions, he was paid but received them late because of that restriction.

In June 2012, Kevin informed Chris during a meeting in Georgia that he was an at-will employee.  Chris responded that he was not an at-will employee because he had an employment agreement with CGM that provided for $170,000 in salary, health

---

[6] No discussion occurred about the bonuses in connection with the commissions.  Based on the record, the commissions appear to have been aimed at increasing Chris's production and annual income, after the reduction in his salary.

insurance, and 10% of "annual CGM profit."  Kevin asked Chris to produce the agreement.  When Chris returned home, he found the agreement in his files and mailed a copy of the employment agreement to Kevin.[7]  Kevin and Chuck deny that they ever had an employment agreement with Chris.

In late 2012, Chris asked Kevin for a raise.  Chris's salary was raised to $140,000, but in exchange, his commission percentage was reduced.  Chris did not raise the issue of his bonus during the compensation discussions.

By July of 2014, Chris was dissatisfied with CGM's payment of his commissions.  In October of 2014, Chris met with Chuck and Kevin in Georgia.  Chuck and Kevin gave Chris options for his compensation and employment at CGM, which involved significant changes in both.  A second meeting was scheduled for November 17, 2014.

Chris states that he was having financial difficulties because of the reduction in his salary and his family's unanticipated medical expenses and that he had "difficulty coming to the conclusion that Kevin and Chuck were lying to me about CGM's finances."  Chris suffered a breakdown in November

---

[7] During his deposition, Chris did not specifically remember the process of mailing the agreement but believes he did mail it because Kevin asked him to send it.  Contemporaneous e-mails between Chris and Kevin document that Chris raised the issue of the employment agreement, that Kevin asked for a copy, and that Chris sent a copy to Kevin by regular mail on June 26, 2012.

of 2014.   CGM approved a medical leave of absence for him.   CGM
terminated Chris's employment effective January 31, 2015.

　　After his termination, Chris kept the laptop computer that
CGM had provided to him, which he had used for both business and
personal purposes, and other items related to his work for CGM.
Chris understood that the laptop was his, provided as a benefit.[8]
On May 1, 2015, CGM asked Chris to return the laptop and other
CGM property.   Chris returned other items but did not return the
laptop because it held personal confidential information.

　　Chris agreed to return the laptop after he removed his
personal information, but CGM rejected that proposal.   Chris
then removed CGM's software and data from the laptop and
proposed to keep the laptop with his personal information.[9]   CGM
was disappointed that Chris had removed files from the laptop
and did not agree to let him keep the laptop.

　　Chris and CGM decided to have a company in Boston, Evidox,
generate an index of the programs on the laptop.   Chris contends
that the index was not helpful because it showed hundreds of

---

[8] CGM contends that its employee handbook states that company
computers belong to CGM and that personal information on the
computers is subject to inspection.   Chris states that the
employee handbook was not effective until after Chris stopped
working at CGM.

[9] Chris states in his affidavit that he copied the software,
source code, and other intellectual property CGM wanted to a
thumb drive and provided it to CGM, through counsel.   He also
proposed to "wipe the hard drive" of all of CGM's information.

thousands of programs without sufficient analysis.  Chris
believed that additional analysis would be expensive and not
necessarily productive.

CGM contends that the Evidox index was extremely revealing
because it showed that Chris had opened dozens of CGM files
after his termination.  Kevin asserts in his declaration that
Chris did not have permission to use the laptop after his
termination.  He reviewed the index and identified thirty-eight
files that he believed Chris opened, created, or modified after
November of 2014.  The files Kevin cites include employment
applications and downloads from corporate websites for companies
outside of New Hampshire.  Kevin does not identify specific CGM
files in his declaration.  The computer is being stored at
Evidox for a monthly fee.

CGM states in an interrogatory answer that it needs to have
Chris's laptop to check and maintain software that was developed
or compiled by Chris because that computer is "native to the
software."  CGM also states that it had to redirect and educate
staff and hire external resources to "rewrite and work around
the issues caused by Plaintiff's retention of CGM physical and
intellectual property," which has cost and continues to cost
about $10,000 to $15,000 per month.  One example CGM provides is
that an issue exists for a customer that cannot be resolved
without access to Chris's laptop.

Chris contacted employees at FairPoint Communications, Inc., a CGM customer, to maintain his relationship with FairPoint after he was terminated by CGM.  Chris's counsel contacted one of the employees at FairPoint about this lawsuit, specifically seeking information related to CGM's motion to dismiss for lack of personal jurisdiction or to transfer the case to Georgia.  FairPoint's attorney contacted CGM, told Chris's counsel he did not want the employee to be deposed, and then told the parties to agree on an affidavit for that employee, which they did.  CGM has lost revenue from FairPoint since Chris left.

For purposes of this suit, Chris retained Paul E. Hendrickson, C.P.A., to calculate the bonus Chris should have received from CGM under the employment agreement.  Hendrickson reviewed CGM's financial records, including tax returns, and calculated bonuses for each year from 2001 through 2014.

## Discussion

Chris seeks summary judgment on his breach of contract claim and on the counterclaims brought against him by CGM.  CGM moves for summary judgment in its favor on Chris's claims against it.

A.   Breach of Contract

     "The elements of a breach of contract claim in Georgia are:
(1) a valid contract; (2) material breach of its terms; and (3)
resultant damages to the party having the right to complain that
the contract has been broken." Fed. Nat'l Mortg. Ass'n v.
Prowant, --- F.Supp.3d ---, 2016 WL 5243409, at *9 (N.D. Ga.
Sept. 21, 2016).[10]  Chris alleges that CGM breached Section 2,
paragraph 2, of the employment agreement by failing to pay him
bonuses.  CGM brought a counterclaim for breach of contract
against Chris based on an implied contractual duty to deliver to
CGM all intellectual property that he developed or modified
during his employment and, alternatively, on Section 7 of the
employment agreement pertaining to the return of CGM's property.

     1. Chris's Motion for Summary Judgment on his Breach of
        Contract Claim

     In his breach of contract claim, Chris contends that CGM
breached the employment agreement he signed on May 24, 2001, by
failing to pay him bonuses as provided in Section 2, paragraph 2
of the employment agreement.  Chris seeks summary judgment in
his favor on his breach of contract claim.  CGM asserts that

_____

     [10] The parties agree that the breach of contract claim and
counterclaim is governed by Georgia law, based on the choice-of-
law provision in the contract.  See Hobin v. Coldwell Banker
Residential Affiliates, Inc., 144 N.H. 626, 628 (2000).

Chris cannot prove his breach of contract claim because there was no employment agreement, he suffered no damages, the claim is untimely, he has waived the claim, he agreed to modify the employment agreement, and the claim is barred by the statute of frauds.

### a.  Employment agreement

By statute, "[t]o constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." Ga. Code. Ann. § 13-3-1.  "Under Georgia law, a contract is enforceable if there is (a) a definite offer and (b) complete acceptance (c) for consideration." Lambert v. Austin Indus., 544 F.3d 1192, 1195 (11th Cir. 2008); Valente v. Int'l Follies, Inc., 2016 WL 3128528, at *2 (N.D. Ga. Jan. 6, 2016).

Chris alleges in his complaint that CGM breached Section 2, paragraph 2 of the employment agreement by failing to pay him bonuses.[11]  In his motion for summary judgment, Chris relies on the email from Chuck dated March 27, 2001, the attached

---

[11] Section 2, paragraph 2, of the employment agreement provides:  "Bonus.  While employed hereunder, Employee will also receive 10% of the annual earnings of Company (prorated in year one), to be calculated on a calendar year basis, and to be paid upon normal closure of the Company's annual books."  The paragraph goes on to explain the alternative terms in the event CGM were acquired by CCG.

spreadsheet, and the employment agreement he signed on May 24, 2001, taken together to show that CGM owed him bonuses.[12]  For purposes of objecting to CGM's motion for summary judgment, Chris broadens his view of the employment agreement:  "The essential terms of the employment agreement between Christopher Campbell and CGM is evidenced by three kind [sic] of documents: emails from CGM to Christopher Campbell . . . , spreadsheets from CGM projecting the expected bonuses to be paid annually if Christopher Campbell joined the business . . ., and the Employment Agreement between the parties . . . ."  Doc. No. 48 at 3.

Multiple documents may be considered together as a contract "as long as all the necessary terms are contained in signed contemporaneous writings."  Bd. of Regents of Univ. Sys. Of Ga. v. Tyson, 404 S.E. 2d 557, 559 (Ga. 1991) (internal quotation marks omitted).  Here, however, Chris has not addressed the requirements for showing that the multiple documents he cites may be considered as a single contract.  In addition, in the complaint he specifically alleges breach of the written employment agreement, not breach of a contract composed of

---

[12] Chris does not limit CGM's bonus obligation in the complaint to any specific period.  In his motion for partial summary judgment, however, he appears to limit the breach of contract claim to bonuses for 2001 through 2004, totaling $373,000.  See Doc. no. 45 at 5 (Chris's memorandum does not have page numbers).

multiple documents.  Because Chris cannot amend his complaint through his motion for summary judgment, his breach of contract claim is limited to CGM's breach of Section 2, paragraph 2 of the employment agreement that he signed on May 24, 2001.[13]

No representative signed the agreement on behalf of CGM. Chuck denies that Chris signed the agreement and returned it to CGM and denies that Chris had an employment agreement with CGM. As presented in the summary judgment record, the circumstances surrounding the employment agreement are disputed.  Therefore, Chris has not shown, based on undisputed facts, that the employment agreement he signed, with the date of May 24, 2001, is valid and enforceable against CGM.  As a result, he is not entitled to summary judgment in his favor on his breach of contract claim.

      b.   <u>CGM's Defenses</u>

Because Chris's motion for summary judgment on his breach of contract claim is denied due to material factual issues, the

---

[13] In addition, as CGM points out, the written employment agreement includes a merger clause titled "Entire Agreement" which provides that the agreement is the "final expression of their agreement;" "is the complete and exclusive statement of the terms of their agreement, notwithstanding any representations, statements, or agreements to the contrary heretofore made;" and "[t]his agreement supersedes any former agreements governing the same subject matter."  Therefore, to the extent the written employment agreement is enforceable, the prior emails cannot be considered as part of the agreement.

court does not reach CGM's defenses.  Those defenses are considered, however, in the context of CGM's motion for summary judgment.

   2.   CGM's Motion for Summary Judgment on Chris's Breach of
        Contract Claim

     CGM seeks summary judgment based on its defenses of the statute of limitations, waiver, the statute of frauds, and the merger clause in the agreement.  Chris objects to the motion.

           a.   Statute of Limitations

     CGM contends that Chris's breach of contract claim is governed by Georgia's four-year limitations period because the employment agreement was not signed by CGM.  CGM asserts that the four-year limitation period began in 2001 and 2002 and expired long before Chris brought suit in 2015.  Chris argues that the six-year period applies and that the employment agreement is a divisible installment contract.

           i.   Governing limitation period

     "Under Georgia law, written contracts are subject to the six-year statute of limitation imposed by OGCA § 9-3-24, whereas oral/parol contracts are subject to the four-year statute of limitation imposed by OCGA § 9-3-25."  Harris v. Baker, 652 S. E. 2d 867, 868 (Ga. Ct. App. 2007).  When an agreement is partly

in writing and partly oral or when essential terms must be
implied from oral agreements, for purposes of the statute of
limitations, the agreement is considered oral.  Id. at 869.
The six-year limitation period applies to a written contract,
however, even when the defendant's acceptance of the contract is
by performance rather than signing.  Phoenix Recovery Gr., Inc.
v. Mehta, 663 S.E.2d 290, 291-92 (Ga. Ct. App. 2008); Hill v.
Am. Express, 657 S.E.2d 547, 548 (Ga. Ct. App. 2008).

In this case, Chris asserts that CGM breached Section 2,
Paragraph 2, of the written employment agreement.[14]  Although no
one signed the agreement on behalf of CGM, CGM arguably accepted
the terms of the agreement by performance when Chris began
working for CGM and was paid.  Therefore, the six-year
limitation period governs the breach of contract claim in this
case if the employment agreement is proven to be an enforceable
contract.

## ii.  Application of limitation period

A cause of action for breach of contract accrues when the
breach occurs, not when the harm or result of the breach is

---

[14] In contrast, the construction "agreement" in Harris
consisted of an untitled and unsigned list of construction
related items and prices with a total price and a set of
construction blue prints.  The court concluded in Harris that
the documents did not provide a complete contract because they
lacked essential terms, which were agreed to separately.
Harris, 652 S.E.2d 869-70.

discovered.  Dillon v. Reid, 717 S.E.2d 542, 547 (Ga. Ct. App.
2011).  Therefore, the cause of action for breach of contract in
this case ordinarily would have accrued when the employment
contract was breached, which was more than six years before
Chris brought suit.  Chris argues, however, that the employment
contract is a divisible installment contract so that the statute
of limitations runs from each failure to pay an annual bonus.
CGM contends that the employment agreement is not a divisible
installment contract and that the claim is time barred.

"When the statute of limitations begins running on a breach
of contract claim depends on whether the agreement is entire or
divisible."  Baker v. Brannen/Goddard Co., 559 S.E.2d 450, 453
(Ga. 2002).  If the contract is divisible, the statute of
limitations "'will run separately as to each payment or
performance when it becomes due, either as an independent
obligation or as a return for an installment of the counter-
performance.'"  Carswell v. Oconee Reg'l Med. Ctr., Inc., 605
S.E.2d 879, 881 (Ga. Ct. App. 2004) (quoting Piedmont Life Ins.
Co. v. Bell, 119 S.E. 2d 63, 72 (Ga. Ct. App. 1961)).  Under
Georgia law, "an entire contract involves a single sum certain"
while "a contract is divisible if the quantity, service, or
thing is to be accepted by successive performances."  Wood v.
Unified Gov't of Athens-Clarke County, Ga., 818 F.3d 1244, 1247-

(11th Cir. 2016); see also Cahoon v. Kubatzky, 226 S.E.2d 467, 469 (Ga. Ct. App. 1976).

Under the employment agreement, the term of employment was for one year, unless terminated in the first year, and then automatically renewed in one year terms unless either party provided notice of his intent to let the agreement expire.  The agreement was not terminated in the first year and presumably automatically renewed thereafter.  The agreement also provided that the employee would receive annual bonuses of 10% of the company's annual earnings, to be calculated and paid on a calendar year basis.

The terms of the employment agreement better fit the description of a divisible contact.  The agreement does not provide for a single sum certain but instead promises to pay annual bonuses that depend on the company's annual earnings.  Therefore, the statute of limitations ran separately from each year that the bonus was not paid.

### iii. Statute of Frauds

The statute of frauds in Georgia provides that to be binding "[a]ny agreement that is not to be performed within one year from the making thereof . . . must be in writing and signed by the party to be charged therewith or some person lawfully authorized by him." Ga. Code Ann. § 13-5-30.  An exception

exists, however, "'where there has been performance on one side, accepted by the other in accordance with the contract.'" Hemispherx Biopharma, Inc. v. Mid-South Cap., Inc., 690 F.3d 1216, 1226 (11th Cir. 2012) (quoting Ga. Code Ann. § 13-5-31(2)).  "The party seeking to enforce an unsigned agreement under this exception, [] must show mutuality of action; that is, that it performed one or more acts pursuant to and in furtherance of the contract sought to be enforced, and the other party accepted that performance pursuant to the agreement." Hemispherx, 690 F.3d at 1226.

In this case, Chris contends that CGM accepted his performance under the terms of the written employment agreement. CGM contends that there was never a written employment agreement, that it did not agree to the terms of the written agreement, and that Chris only signed a draft agreement for purposes of this case.[15]  It is undisputed that Chris did start working for CGM on June 1, 2001, and continued to work at CGM until the end of 2014.  Therefore, if there was an enforceable written agreement that Chris signed in 2001, the statute of frauds does not bar Chris's breach of contract claim.

---

[15] Chuck states in his declaration under penalty of perjury that he believes Chris signed the agreement just before filing suit.  Doc. no. 44-5, ¶ 17.

iv.   <u>Waiver</u>

CGM contends that Chris waived any breach of contract claim for the unpaid bonuses by failing to assert promptly his right to the unpaid bonuses.  In support, CGM relies on <u>Clower v. Orthalliance, Inc.,</u> 337 F. Supp. 2d 1322, 1331 (N.D. Ga. 2004). In <u>Clower</u>, the plaintiff alleged that the defendant had never fully performed under a service contract.  The court barred the claim for breach of contract based on an election of remedies, that is, because the plaintiff had elected to continue under the contract, despite a lack of full performance by the defendant, instead of bringing suit.  <u>Id.</u>  The court held that when the defendant breaches the contract and the plaintiff knows that the breach has occurred, the plaintiff must choose either to refuse to perform and bring suit or accept the breach and continue to perform under the contract.  <u>Id.</u> at 1331-32.

In this case, however, it is at least disputed whether Chris knew that CGM was breaching the employment contact before his employment was terminated.  Under the employment agreement, CGM was required to pay bonuses of 10% of the company's annual earnings.  Chuck and Kevin told Chris that the company did not have annual earnings so no bonuses were due.  In fact, they reduced Chris's salary on the ground that the company was experiencing difficult financial circumstances.  If Chris did not know that CGM had breached the employment agreement, Chris

25

could not choose between the options identified in <u>Clower</u>.  As a result, CGM has not shown that Chris waived his claim through an election of remedies.

### v.   Modification

CGM argues that the employment agreement was modified when CGM offered and Chris accepted commissions.  CGM argues that the commission modification changed the compensation structure so that it was no longer required to pay bonuses.  Chris contends that he never agreed to give up bonuses in exchange for commissions.

The employment agreement provides that it can only be modified "by a written instrument signed by each of the parties hereto."  CGM provides no evidence of a written change to the employment agreement.  In addition, under the circumstances that existed when CGM offered commissions, it appeared that the commissions were intended to fill the gap between Chris's original salary and the lower salary he was being paid in 2009. In any case, CGM offers no evidence that the commissions were offered and accepted as compensation in lieu of annual bonuses.

### 3.  CGM's Breach of Contract Counterclaim

CGM alleges that Chris breached an implied contractual duty to deliver to CGM all intellectual property that he developed or

modified during his employment.  CGM also alleges that Chris breached section 7 of the employment agreement.

In his motion for partial summary judgment, Chris contends that CGM cannot show that he breached the employment agreement by failing to return the laptop computer.  In support, Chris contends that he offered to return the computer if he could remove personal information and that CGM cannot show damages. Chris does not address that part of the claim brought under a theory of an implied contract.

In its objection, CGM attempts to expand its counterclaim to include other provisions in the employment agreement that were not alleged in the counterclaim.[16]  CGM also asserts that nominal damages may be recovered for breach of contract.

The employment agreement provides that records, software, documents, and laptop computers, among other things, are the property of CGM and must be returned to CGM upon termination of employment.  Factual disputes about the enforceability of the agreement and about Chris's retention and use of the computer prevent summary judgment in Chris's favor on CGM's counterclaim for breach of contract.

---

[16] CGM cannot amend its counterclaim in its objection to summary judgment.  See Martinez v. Petrenko, 2014 WL 12550380, at *2 (D.N.H. Feb. 10, 2014).  In addition, to the extent it relies on the employment agreement for the claim, it must show that the agreement is valid and enforceable, a status that CGM disputes.

B.  Chris's Claim for Fraud/Deceit/Misrepresentation

     CGM moves for summary judgment on Chris's fraud claim on
the grounds that the claim is untimely, that the claim is barred
by the economic loss doctrine, and that Chris cannot prove the
elements of fraud.  Chris objects, asserting that he can prove
fraud and that CGM's defenses lack merit.

     1.  Fraud

     To prove fraud, Chris must show that CGM made a
representation to him "with knowledge of its falsity or with
conscious indifference to its truth and with the intention of
causing [him] to rely on the representation." [17]  Tessier v.
Rockefeller, 162 N.H. 324, 332 (2011) (internal quotation marks

---

[17] The parties cite New Hampshire law in support of their
motions addressing the tort claims and counterclaims, although
Chris cites both Georgia law and New Hampshire law in his motion
for summary judgment on the conversion claim.  When a court sits
in diversity jurisdiction, it generally applies the substantive
law of the forum state.  Erie R.R. Co. v. Tompkins, 304 U.S. 64,
78 (1938).  When it is necessary to make a choice among
different states' laws, the court applies the choice-of-law
rules of the forum state.  Klaxon Co. v. Stentor Elec. Mfg. Co.,
Inc., 313 U.S. 487, 496-97 (1941).  A choice-of-law provision in
a contract at issue in the case will not govern tort claims
unless the provision expressly includes such claims.  Coldwell
Banker Real Estate, LLC v. Brian Moses Realty, Inc., 752 F.
Supp. 2d 148, 164 (D.N.H. 2010).  Here, neither party argues
that Georgia law should be applied to the tort claims and
counterclaims under the contract clause or under New Hampshire's
choice of law standard.  Therefore, New Hampshire law governs
the tort claims.

omitted).  The plaintiff's reliance must also have been
justifiable and must have caused pecuniary loss.  Id.

Chris asserts, supported by his affidavits, that CGM
promised to pay him an annual bonus of 10% of annual earnings
and that he relied on the promise to accept and continue
employment at CGM.  He further asserts that Chuck's
representations from 2002 through 2005 that CGM did not have
annual earnings to pay him a bonus were misrepresentations of
CGM's financial condition and annual earnings and that CGM has
regularly misrepresented its financial condition and annual
earnings.  In addition, he contends that the misrepresentations
were made intentionally to keep him working for CGM without
paying him the promised bonuses.  CGM asserts that Chris cannot
prove that any representations were made with knowledge of their
falsity and with the intent to cause his reliance.  Even if
Chris could prove his fraud claim, it is barred by the economic
loss doctrine.

2.  Economic Loss Doctrine

Under New Hampshire law, the economic loss doctrine
"operates generally to preclude contracting parties from
pursuing tort recovery for purely economic or commercial losses
associated with the contract relationship."  Wyle v. Lees, 162
N.H. 406, 410 (2011) (internal quotation marks omitted).  Even

when a plaintiff cannot recover economic loss in a contract
action, the economic loss doctrine bars a tort action for
economic loss unless the claim falls within the exceptions for
circumstances when a defendant owes an independent duty to the
plaintiff and when misrepresentations precede formation of the
contract.  Id.; Plourde Sand & Gravel v. JGI Eastern, Inc., 154
N.H. 791, 796-99 (2007).

     Chris contends that the economic loss doctrine does not
apply to his fraud claim because Chuck, as his twin brother,
owed him an independent duty because of their special
relationship.  The special relationship exception to the
economic loss doctrine is narrow and must arise from a
relationship that imposes an additional legal duty on the
defendant outside the terms of the contract.  See Wyle, 162 N.H.
at 410; Plourde, 154 N.H. at 796.  Chris has not identified what
duty his family relationship with Chuck imposed on CGM.[18]

     Therefore, Chris's fraud claim is barred by the economic
loss doctrine.  As a result, it is not necessary to consider
CGM's statute of limitations defense.  CGM is entitled to
summary judgment on the fraud claim.

---

     [18] The family relationship between Chris and Chuck, alone, does
not support the special relationship exception that is necessary
to avoid the economic loss doctrine.  Although brothers might
hope for and even expect honest and straightforward treatment
from each other, Chris has not shown that Chuck owed him a legal
duty outside of the CGM contract.

C.  Chris's Consumer Protection Act ("CPA") Claim

    Chris alleges that CGM's promise to pay him annual bonuses
of 10% of annual earnings to induce him to bring his business
and join CGM was false and deceptive in violation of the CPA,
New Hampshire RSA chapter 358-A.  He further alleges that CGM's
failure to pay the promised bonuses and its refusal to allow him
to review the company finances was also false and deceptive in
violation of the CPA.  CGM moves for summary judgment on the
grounds that Chris cannot prove a claim under the CPA and the
claim is untimely.

    1.  Merits

    The Consumer Protection Act, RSA 358-A, prohibits persons
from using "any unfair method of competition or any unfair or
deceptive act or practice in the conduct of any trade or
commerce within this state."  RSA 358-A:2.  RSA 358-A:2 lists
some, but not all, of the actions that fall within the Act's
prohibition.  ACAS Acquisitions (Precitech) Inc. v. Hobert, 155
N.H. 381, 402 (2007).  For non-listed actions to implicate the
Act, "the objectionable conduct must attain a level of rascality
that would raise any eyebrow of someone inured to the rough and
tumble of the world of commerce."  Id.  CGM argues that its

31

relationship with Chris did not arise in the context of trade or commerce.

To the extent Chris's claim is that CGM did not fulfill the promises it made to him under his employment agreement, he has not shown a violation of the Act.  The New Hampshire Supreme Court has not decided whether the Consumer Protection Act applies to employment disputes.  Romano v. Site Acquisitions, Inc., 2016 WL 50471, at *3 (D.N.H. Jan. 4, 2016).  Another judge in this district has determined that the New Hampshire Supreme Court would conclude that the Act does not cover a claim based on the breach of duties owed under an employment contract.  Jon-Don Prods., Inc. v. Malone, 2003 WL 1856420, at *3 (D.N.H. Apr. 10, 2003).  In addition, "the mere allegation of a breach of an employment contract, or any ordinary contract, fails to state a CPA claim."  Romano, 2016 WL 50471, at *3.

Chris contends, however, that CGM offered him bonuses to induce him to close Intellinet and to bring his business to CGM.  Chuck's emails and spreadsheet in March of 2001 support that claim.  He further contends that after he joined CGM with those expectations, CGM refused to make the promised bonus payments, reduced his salary, and misrepresented the financial condition of the company.  While an employment relationship is not subject to the CPA, the business relationship in which Chris was induced to close Intellinet and bring his business to CGM based on

promises of a certain salary and bonuses may be a transaction between entities engaged in business and transacting in a business context.  See Ellis v. Candia Trailers & Snow Equip., Inc., 164 N.H. 457, 465-66 (2012).

While an ordinary breach of contract claim does not show a violation of the Act, "a defendant who induces the plaintiff to enter a contract based on a knowing misrepresentation of the promisor's intent to perform under the contract violates the Consumer Protection Act."  Moulton v. Bane, 2016 WL 1091093, at *12 (D.N.H. Mar. 21, 2016).  In addition, "misrepresentations made by a defendant in an ongoing effort to avoid performing under an agreement, when the defendant did not intend to perform, also violate the CPA."  Id.  As such, material factual disputes prevent summary judgment on Chris's claim on the merits.

### 2.  Statute of Limitations

CGM asserts, based on cases from 1995 and 1992, that "CPA claims are subject to a two-year statute of limitations" and that the discovery rule and equitable tolling do not apply.  The CPA was amended in 1996, which extended the limitations period to three years and incorporated a discovery rule provision.  Murray v. McNamara, 167 N.H. 474, 477 (2015).  "To determine whether a claim is exempt from the CPA, [the court] look[s] back

from the time the plaintiffs 'knew or reasonably should have known' of the alleged violation.  If the transaction at issue occurred more than three years before that time, then it is exempt."  Id. at 478.

CGM did not present a statute of limitations defense under the governing law.  Therefore, that defense cannot support CGM's motion for summary judgment.

D.  Chris's Claim for Lost Wages under RSA Chapter 275

Chris claims the unpaid bonuses from CGM are unpaid wages under RSA 275:42, III, and seeks an additional award under RSA 275:44, IV. CGM contends that Chris's claim for unpaid wages is barred because it is untimely and by the statute of frauds.

Chris agrees that his wages claim is governed by a three-year statute of limitations.  See RSA 508:4,I.  He argues, however, that the three-year limitation period runs from each date when the wages were due.  See Rosenzweig v. Morton, 144 N.H. 9, 12 (1999).  He contends that the three-year period runs after his bonus was not paid each year, so that his claims for bonuses for the three years before he filed suit are within the limitations period.  CGM did not respond to Chris's application of the statute of limitations.

CGM also contends that Chris's wage claim is barred by the statute of frauds because he cannot enforce an unwritten promise

34

for bonuses.  For the reasons explained above, a material factual dispute remains as to whether there is a written employment agreement in this case.[19]  Therefore, the statute of frauds does not bar the claim for purposes of summary judgment.

E.  CGM's Counterclaim for Conversion

In addition to claiming that Chris breached the employment agreement by retaining the laptop, CGM also asserts a claim of conversion based on retention of the laptop.  Chris moves for summary judgment, asserting that CGM cannot prove the counterclaim because he offered to return the laptop with the reasonable condition that he be allowed to remove his personal information.  CGM asserts that the laptop and the programs and software on the laptop are CGM's property and that good faith is not a defense to the tort of conversion.

To succeed on a claim of conversion, the plaintiff must show that the defendant intentionally exercised dominion or control over the plaintiff's property and that the defendant's actions seriously interfered with the plaintiff's right to the property.  Muzzy v. Rockingham Cty. Tr. Co., 113 N.H. 520, 523 (1973).  In determining the viability of a conversion claim, the

_____

[19] To the extent Chris attempts to avoid the statute of frauds by raising a theory of promissory estoppel, that claim is not pleaded in the amended complaint.  Chris cannot amend his complaint by raising a new claim in his objection to summary judgment.

court considers "the extent and duration of the exercise of control over the goods, the intent to assert a right inconsistent with the other party's right of control, and good faith." Kingston 1686 House, Inc. v. B.S.P. Transp., Inc., 121 N.H. 93, 95 (1981); accord Sykes v. RBS Citizens, N.A., 2016 WL 738210, at *2 (D.N.H. Feb. 23, 2016); Moulton v. Bane, 2015 WL 7274061, at *10 (D.N.H. Nov. 16, 2015).  Although "[e]arlier New Hampshire cases held that the defendant's good faith does not preclude a finding of conversion, . . . [t]he court follows the most recent conversion cases which include good faith as a relevant factor." Askenaizer v. Moate, 406 B.R. 444, 452 n.6 (D.N.H. 2009); see also In re BeaconVision Inc., 2009 WL 151594, at *5 (Bankr. D.N.H. Jan. 20, 2009).[20]

---

[20] CGM cites a decision from the BeaconVision case, which preceded In re BeaconVision Inc., 2009 WL 151594 (Bankr. D.N.H. Jan. 20, 2009), to support its view that good faith is not a defense to conversion. In re BeaconVision Inc., 340 B.R. 674, 679 (Bankr. D.N.H. 2006).  In that decision, the court stated, relying on an older New Hampshire case, that "good faith does not rescue a party from liability," but also stated that "the tortfeasor must have known that his conduct was substantially certain to result in injury."  Id.  Contrary to CGM's representation, the rule recognized in the later decision, In re BeaconVision Inc., 2009 WL 151594, at *5 (Bankr. D.N.H. Jan. 20, 2009), is the governing law.

CGM also relies on Lumber Ins. Cos., Inc. v. Allen, 820 F. Supp. 33, 37 (D.N.H. 1993), in which the court considered an issue of insurance coverage for a claim of negligent trespass and conversion in the context of cutting trees on someone else's property.  The court relied on a comment to the Restatement (Second) of Torts, § 164, pertaining to intrusions onto land held by another, to determine that the term "accident" in the policy could include intentional conduct, such as trespass and

Significant factual disputes remain about whether Chris had a good faith belief that he could retain the laptop and whether his proposed solution of taking his personal information off of the laptop before returning it was reasonable.  Therefore, Chris has not shown that he is entitled to summary judgment on CGM's conversion counterclaim.

F.  CGM's Counterclaim under the Computer Fraud and Abuse Act ("CFAA")

CGM alleges that Chris was required to return the laptop to CGM at the end of his employment there, that he did not return the laptop, and that he accessed the laptop without authorization and with the intent to defraud CGM and to obtain CGM's intellectual property from the laptop.  CGM further alleges that Chris caused damage, including financial damage to CGM.  Chris moves for summary judgment on CGM's CFAA counterclaim on the grounds that the laptop was not being used in interstate commerce during the allegedly unauthorized use, that he believed the laptop was a benefit of his employment at CGM, that CGM has no proof that it suffered $5,000 in damages, and that CGM caused its own loss by refusing to reach a

---

conversion.  Id.  That case is not persuasive here to show that Chris's good faith or reasonable belief about his retention of the laptop, under the circumstances, is not a defense to CGM's conversion claim.

reasonable accommodation for Chris's private information on the laptop.

Under CFAA, a private cause of action exists for damages and injunctive relief due to a loss caused by a violation of 18 U.S.C. § 1030(a).  See 18 U.S.C. § 1030(g).  Section 1030(a) provides a long list of prohibited computer conduct.

CGM does not identify which provision of § 1030(a) it alleges Chris has violated.  Assuming that CGM intended to proceed under §§ 1030(a)(4) and (5)(C), Chris moves for summary judgment on the grounds that CGM lacks evidence that it has suffered a loss of at least $5,000 and that the laptop was used in interstate commerce.

Section 1030(a)(4) pertains to a person who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period."  Section 1030(a)(5)(c) pertains to a person who "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss."  A protected computer, in the context of CGM, is one that is used in interstate commerce. § 1030(e)(2)(B).

CGM responds with evidence that that the laptop was used to contact sites outside of New Hampshire to show that the laptop was used in interstate commerce.  CGM also provides evidence that it has lost more than $5,000 because of Chris's retention of the computer.

Although Chris's actions do not appear to have violated the cited provisions of the Act, Chris did not contest the counterclaim on the merits or challenge the materiality of CGM's evidence of damages.  Instead, Chris challenges the credibility of the evidence itself.  Chris also argues that his children used the laptop to access sites outside of New Hampshire but does not show that their use of the laptop would not satisfy § 1030(e).

Summary judgment is not an appropriate vehicle for seeking credibility determinations.  In the absence of any developed argument on the merits, CGM has shown a factual dispute that precludes summary judgment.

G.  GCM's Counterclaim for Tortious Interference

CGM alleges that Chris contacted FairPoint with the intent to injure CGM and interfered with CGM's contractual relations with FairPoint.  Chris moves for summary judgment on the ground that CGM cannot prove the claim based on an assumption that Chris did something to interfere with its FairPoint business.

"To establish liability for intentional interference with contractual relations, a plaintiff must show:  (1) the plaintiff had an economic relationship with a third party; (2) the defendant knew of this relationship; (3) the defendant intentionally and improperly interfered with this relationship; and (4) the plaintiff was damaged by such interference." Tessier, 162 N.H. 324, 337 (2011).  The intentional interference must cause the third party not to perform under the contract. Id.  "Thus, where contractual obligations were performed, there can be no claim for tortious interference with contractual relations."  Id.

In its objection, CGM states that it is undisputed that it has had a contractual relationship with FairPoint since 2009 and that Chris contacted FairPoint employees after he was terminated from CGM.  Chris stated in his deposition that he contacted the employees to maintain his relationships with them.  Kevin states that since Chris filed the lawsuit, Kevin has had much less communication with Tim Burns at FairPoint.

That evidence is not enough to prove intentional interference with contractual relations.  CGM lacks any evidence that FairPoint failed to perform under a contract with CGM because of interference by Chris.  Therefore, Chris is entitled to summary judgment on that part of the counterclaim brought for intentional interference with contractual relations.

40

To the extent CGM intended to bring a claim for tortious interference with prospective business relations, neither the allegations nor the evidence support that claim.  "To state a claim for tortious interference with a prospective contractual relationship under New Hampshire law the plaintiff must show that the defendant 'induce[d] or otherwise purposely cause[d] a third person not to . . . enter into or continue a business relation with another' and thereby caused harm to the other." Sarah's Hat Boxes, L.L.C. v. Patch Me Up, L.L.C., 2013 WL 1563557, at *13 (D.N.H. Apr. 12, 2013) (quoting Bricker v. Crane, 118 N.H. 249, 252 (1978)).

CGM has evidence that Chris maintained his relationships with FairPoint employees but no evidence that he interfered with CGM's relationship with FairPoint.  CGM has not presented an affidavit or any other evidence from a FairPoint executive or employee to show that because of Chris's communications, FairPoint no longer is doing business with CGM.

Instead, the evidence shows that FairPoint and its president, Patrick McHugh, did not want to be involved in this case.  Therefore, any downturn in CGM's relationship with CGM appears to be the result of the lawsuit between Chris and CGM, not because Chris purposefully caused FairPoint not to continue to do business with CGM.

41

CGM failed to provide evidence to support its tortious interference claim.  As a result, Chris is entitled to summary judgment on that claim.

H.  CGM's Counterclaim for Punitive Damages

In New Hampshire, "[n]o punitive damages shall be awarded in any action, unless otherwise provided by statute."  RSA 507:16.  "Under New Hampshire law, a claim for enhanced damages is not a separate cause of action; it is a request for a particular remedy."  Minion Inc. v. Burdin, 929 F. Supp. 521, 523 (D.N.H. 1996).  Therefore, Chris is entitled to summary judgment on CGM's counterclaim for punitive damages.

## Conclusion

For the foregoing reasons, the plaintiff's motion for partial summary judgment (document no. 45) is granted as to the defendant's counterclaims for tortious interference, Count Four, and punitive damages, Count Five, and is otherwise denied.

The defendant's motion for summary judgment (document no. 44) is granted in part and denied in part.  The six-year statute of limitations applies to the plaintiff's breach of contract claim, Count I, and the employment agreement, if found to be an enforceable contract, is a divisible installment contract.  The motion is granted as to the plaintiff's fraud claim, Count Two, and is otherwise denied.

Now that the motions for summary judgment have been resolved, the claims and counterclaims remaining in the case have been determined.  Before the parties and the court spend the considerable time and resources necessary to prepare for trial, the parties are expected to use their best efforts to resolve all or part of the remaining claims and counterclaims.

 To that end, counsel shall carefully examine their claims, counterclaims, and defenses to evaluate their viability, the proof necessary to support them, and how they will present those matters to a jury.  In particular, counsel should review and evaluate the factual and legal issues pertaining to (1) the existence of an enforceable employment agreement between Chris and CGM; (2) CGM's counterclaims that also depend on a viable employment agreement; (3) Chris's retention and use of the laptop; and (4) the timeliness of the claims.  In examining their cases, counsel should use every effort not to let personal animosity, which appears to be evident in this case, stand in the way of resolving issues that have stagnated, such as the issue of the laptop.

In January of 2016, the parties anticipated participating in mediation during the spring.  No further mediation statement has been filed.  If they have not already done so, the court expects the parties to participate in mediation before trial. The parties shall file a joint mediation statement **on or before**

**February 3, 2017**, in which the parties state whether mediation has been held or has been scheduled.

Due to the number of criminal cases currently scheduled for the trial period beginning on February 22, 2017, the trial of this case is rescheduled to the period beginning on March 7, 2017.  The final pretrial conference will also be rescheduled accordingly.

SO ORDERED.


_____
Joseph DiClerico, Jr.
United States District Judge


January 9, 2017

cc:  Matthew T. Gomes, Esq.
     Timothy John McLaughlin, Esq.
     P. Shane O'Neill, Esq.
     David P. Slawsky, Esq.